## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | |
|---|---|
| Hormel Foods Corporation, | Court File No.: _____ |
| Plaintiff, | |
| v. | **COMPLAINT**<br>**(JURY TRIAL DEMANDED)** |
| Johnsonville, LLC, Brett Sims,<br>and Jeremy Rummel, | |
| Defendants. | |

Plaintiff Hormel Foods Corporation ("Hormel"), by and through its attorneys, brings this action for damages and other relief, stating and alleging the following claims against Defendants Johnsonville, LLC ("Johnsonville"), Brett Sims ("Sims"), and Jeremy Rummel ("Rummel") (collectively "Defendants"):

### INTRODUCTION

1.     Hormel and Johnsonville are business competitors in the sausage marketplace. Rather than fairly compete in that marketplace, Johnsonville, through Sims, Rummel, and perhaps others, appears to have undertaken a coordinated effort to interfere with Hormel's employment relationships and obtain Hormel's confidential, proprietary, and trade secret information.

2.     Johnsonville's behavior dates back to at least 2023 when it hired Hormel's Director of Operations, Sims, who oversaw certain sausage production for Hormel.

3.     Not long after he was hired, Sims, then an agent of Johnsonville, began soliciting Hormel employees in blatant disregard of the contractual non-solicitation

obligations he owed to Hormel and his contractual obligation to share these covenants with Johnsonville.

4.     Sims' campaign was directly responsible for Johnsonville hiring (at minimum) Hormel's Director of Operations, Rummel, whose position focused on sausage products; Hormel's Plant Manager and former Product Manufacturing Manager, Brandon Koehler; and Hormel's Senior Finance Manager, Alison Koehler.

5.     Johnsonville's unlawful behavior did not end with its wrongful solicitation of Hormel employees through Sims. After Rummel accepted employment with Johnsonville, but before he provided notice to Hormel of his intent to resign and join Johnsonville, Rummel began forwarding Hormel's highly sensitive confidential, proprietary, and trade secret information to his personal email account. The only reasonable interpretation of Rummel's actions is that, in sending Hormel confidential business information and trade secrets to his personal email account immediately prior to beginning competitive business activities with Johnsonville, Rummel was attempting to take Hormel's confidential business information and trade secrets to Johnsonville for the express purpose of exploiting the information for Johnsonville's benefit, and to Hormel's detriment, in the marketplace.

6.     Hormel became aware of Rummel's egregious behavior and interviewed him following notice of his impending Hormel resignation, but before he began work at Johnsonville. On information and belief, after the interview and while still a Hormel employee, Rummel traveled to Sheboygan, Wisconsin—the location of Sims' residence

and near Johnsonville's Sheboygan Falls, Wisconsin headquarters. On information and belief, Rummel also then had conversations with Johnsonville's Chief Legal Officer and its outside counsel.

7.      Defendants have violated and continue to violate the law in order to interfere with Hormel's employment relationships and unlawfully obtain Hormel's trade secrets. Hormel brings this action to stop Defendants' wrongful acts and recoup damages for the harm already done and for future harms.

## PARTIES

8.      Hormel is a corporation organized under the laws of the State of Delaware, with its principal office in Austin, Minnesota.

9.      Johnsonville is a limited liability corporation organized under the laws of the State of Delaware, with a principal office in Sheboygan Falls, Wisconsin.

10.     Brett Sims is an individual who, upon information and belief, resides in Sheboygan, Wisconsin. Sims is a former employee of Hormel and a current employee of Johnsonville.

11.     Rummel is an individual who, upon information and belief, resides in Algona, Iowa. Rummel is a former employee of Hormel and a current employee of Johnsonville.

## JURISDICTION AND VENUE

12.     The Court has original jurisdiction over this matter under 28 U.S.C. § 1331 because Hormel asserts a claim under the federal Defend Trade Secrets Act, 28 U.S.C. §

1836, *et seq*.

13.    The Court has supplemental jurisdiction over Hormel's claims brought under state law under 28 U.S.C. § 1367.

14.    This case is properly venued in the United States District Court for the District of Minnesota under 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to Hormel's claims occurred in Minnesota and caused damage to Hormel in Minnesota.

**FACTUAL BACKGROUND**

**I.    THE PARTIES AND THEIR AGREEMENTS.**

**A.    Hormel's Business and Protection of its Confidential Information.**

15.    Hormel is a global branded food company and has been in business for over 130 years.

16.    Hormel's sausage products are industry leading and rely on proprietary recipes and processes, including selecting, grinding, and blending certain spices and meat raw materials, and are the subject of very specific, confidential production processes, marketing plans, and sales plans.

17.    Johnsonville and Hormel compete in the sausage market for the same customers and the same end consumers.

18.    Hormel has cultivated its proprietary business methods, recipes, production processes, marketing, and sales plans at great effort and expense over decades.

19.    The sausage market is increasingly competitive, and improper use of

confidential, proprietary, and trade secret information, or wrongful competition or solicitation, could cause a manufacturer significant competitive economic disadvantage. Accordingly, Hormel takes concerted efforts to safeguard its business, employee relationships, and the secrecy of its valuable information.

20.     Hormel requires certain employees to sign a Proprietary Information, Non-Compete, Non-Solicitation, and Invention Assignment Agreement, or similar agreement, which restricts employees from misusing Hormel's proprietary information or soliciting its employees, among other restrictions.

21.     Hormel also maintains a robust Code of Ethical Business Conduct which clearly and unambiguously advises employees, among other things, of their duty: to secure and protect confidential information, which includes proprietary information and trade secrets, to understand what information falls in these categories, to maintain the secrecy of this information, and to honor their obligations to prevent disclosure.

22.     Hormel regularly trains its employees on compliance with its Code of Ethical Business Conduct and requires annual Code of Ethical Business Conduct certification.

**B.     Sims' Employment with Hormel and His Contractual Obligations.**

23.     Sims commenced employment with Hormel on November 25, 1991. His final position at Hormel was Director of Operations overseeing certain sausage production.

24.     In this role, Sims had extensive involvement in, and access to information about, Hormel's sausage business.

25.     Because of the work Sims performed for Hormel, the sensitivity of the

information to which he had access, and the relationships he built with Hormel's employees, Hormel imposed certain confidentiality obligations on Sims and required him to agree to certain restrictive covenants.

26.     On December 16, 2019, Sims executed a Proprietary Information, Non-Compete, Non-Solicitation, and Invention Assignment Agreement (the "Sims Agreement").

27.     A true and accurate copy of the Sims Agreement is attached hereto as **Exhibit A** and its terms are incorporated by reference into this Complaint.

28.     Sims received adequate consideration in the form of a grant of restricted stock units in exchange for his acceptance of the Sims Agreement.

29.     As it relates to non-solicitation of employees, Sims agreed:

Non-Solicitation of Employees. The Employee will not, directly or indirectly, personally or through another person, hire, assist in the hiring of, or attempt to hire any of Hormel's employees or consultants; or attempt to induce or influence any of Hormel's employees or consultants to terminate their relationships with Hormel.

(Sims Agreement § 9.D.)

30.     Sims agreed that he would not solicit Hormel employees for a period of one year after his termination, and further agreed that the one-year period would be tolled for any period of non-compliance. (Sims Agreement §§ 9, 9.D.)

31.     Sims agreed that he would inform any new employer, prior to accepting employment, of the existence of the Sims Agreement and provide such employer with a copy of the Sims Agreement. (Sims Agreement § 9.B.)

6

32.    The Sims Agreement provides that it will be construed, interpreted, and governed by Minnesota law, and that Hormel is entitled to recover its attorneys' fees, disbursements, and court costs to enforce its rights under the agreement. (Sims Agreement §§ 12, 13.)

33.    Hormel complied with all of its obligations under the Sims Agreement.

**C.    Rummel's Employment with Hormel and His Contractual Obligations.**

34.    Rummel commenced employment with Hormel on June 5, 2000. Rummel last worked for Hormel as a Director of Operations.

35.    In this role, Rummel had extensive involvement in, and access to information about, Hormel's sausage business.

36.    Because of the work Rummel performed for Hormel, the sensitivity of the information to which he had access, and the relationships he built with Hormel's employees, Hormel imposed certain confidentiality obligations on Rummel and required him to agree to certain restrictive covenants.

37.    On December 11, 2019, Rummel executed a Proprietary Information, Non-Compete, Non-Solicitation, and Invention Assignment Agreement (the "Rummel Agreement").

38.    A true and accurate copy of the Rummel Agreement is attached hereto as **Exhibit B** and its terms are incorporated by reference into this Complaint.

39.    Rummel received adequate consideration in the form of a grant of restricted stock units in exchange for his acceptance of the Rummel Agreement.

40.    As it relates to confidential information, Rummel agreed:

The Employee will not at any time, either during or after their employment by Hormel, use or disclose, directly or indirectly, any Hormel PROPRIETARY INFORMATION, except on behalf of Hormel. Further, the Employee will not at any time, either during or after their employment by Hormel, use or disclose, directly or indirectly, any information Hormel has received from third parties that Hormel has agreed to keep confidential, except for the exclusive benefit of Hormel as is required by their duties for Hormel and consistent with Hormel's confidentiality obligations.

(Rummel Agreement § 5.)

41.    The Rummel Agreement defines "Proprietary Information" as:

[I]nformation that is not generally known outside of Hormel including, but not limited to, formulas, patterns, compilations, programs, devices, methods, techniques, processes, systems, research, development, designs, accounting, finance, plans, customer information, personnel information, and pricing policies. . . .

(Rummel Agreement § 4.)

42.    Rummel agreed that he would inform any new employer, prior to accepting employment, of the existence of the Rummel Agreement and provide such employer with a copy of the agreement. (Rummel Agreement § 9.B.)

43.    The Rummel Agreement provides that it will be construed, interpreted, and governed by Minnesota law, and that Hormel is entitled to recover its attorneys' fees, disbursements, and court costs to enforce its rights under the agreement. (Rummel Agreement §§ 12, 13.)

44.    Hormel complied with all of its obligations under the Rummel Agreement.

## II.  SIMS AND RUMMEL JOIN JOHNSONVILLE AND VIOLATE LEGAL OBLIGATIONS TO HORMEL.

### A.  Sims Joins Johnsonville and Immediately Breaches his Agreement.

45.     In or about June 2023, Sims accepted the position of Chief Supply Chain Officer at Johnsonville.

46.     Because Sims agreed to provide a copy of the Sims Agreement to any potential employer, Johnsonville knew or should have known of Sims' non-solicitation obligations.

47.     Upon information and belief, Sims, as an agent of Johnsonville, immediately began to solicit Hormel employees upon his hire at Johnsonville in direct contravention of his non-solicitation restrictions.

48.     Sims solicited Rummel shortly after joining Johnsonville and continued to solicit Rummel for the next two years.

49.     Sims also solicited Brandon Koehler, Hormel's Plant Manager and former Product Manufacturing Manager, and Alison Koehler, Senior Finance Manager.

50.     Sims' solicitation was successful, and Rummel and the Koehlers resigned from Hormel in May 2025 to join Johnsonville.

51.     Rummel admitted to Hormel that Sims' solicitation, while an agent of Johnsonville, led to his employment at Johnsonville.

52.     Brandon Koehler admitted to Hormel that Sims' solicitation, while an agent of Johnsonville, led to his employment at Johnsonville.

53.     Alison Koehler admitted to Hormel that Sims' solicitation, while an agent of

Johnsonville, led to her employment at Johnsonville.

54.    Sims' solicitation of Rummel and the Koehlers each independently violated the Sims Agreement.

55.    Upon information and belief, as an agent of Johnsonville, Sims solicited other Hormel employees in direct violation of the Sims Agreement.

56.    Upon information and belief, Sims solicited these employees to give Johnsonville an unfair competitive advantage over Hormel.

57.    Upon information and belief, Sims solicited these employees with the support of Johnsonville.

**B.    Rummel Violates his Agreement.**

58.    In or about April 2025, Rummel accepted employment with Johnsonville.

59.    In, at a minimum, April 2025, after accepting employment with Johnsonville but before informing Hormel of his intent to resign from Hormel to join Johnsonville, Rummel used his Hormel email account to send Hormel's highly confidential, proprietary, and trade secret information to his personal email account.

60.    The information Rummel sent to his personal email account included, *inter alia*, Hormel's product formulas, processing procedures, acquisition target information, and marketing strategy information.[1]

---

[1] Hormel will provide more detailed information regarding the confidential, proprietary, and trade secret information when it can be done under seal and a protective order is in place. Because Rummel sent these documents to his personal email account, he is already on notice of the information at issue.

61.    Specifically, Rummel sent significant information related to Hormel's sausage manufacturing process and products to his personal email account without any Hormel business reason to do so.

62.    The information Rummel sent to his personal email account includes "Proprietary Information" as defined in the Rummel Agreement, comprising Hormel's confidential, proprietary, and trade secret information.

63.    Upon information and belief, Rummel emailed these files to his personal email account at the direction of and/or in cooperation or anticipated cooperation with Johnsonville, for the sole purpose of enabling Johnsonville to interfere with Hormel's business.

64.    Because Rummel agreed he would provide a copy of the Rummel Agreement to any potential employer, Johnsonville knew or should have known of Rummel's confidentiality obligations.

**C.    Hormel Confronts Rummel; Rummel Admits to his Misconduct.**

65.    On May 21, 2025, Hormel discovered that Rummel sent information to his personal email account.

66.    On May 22, 2025, Hormel interviewed Rummel regarding his behavior.

67.    Initially, Rummel denied sending confidential and proprietary Hormel information to his personal email. After being presented with evidence of the email activity, he reviewed emails on his cell phone and admitted some of them contained confidential and proprietary Hormel information.

68.    During the interview, Rummel disclosed that Sims had been soliciting him for employment with business competitor Johnsonville since 2023.

**D.    Rummel's Actions Confirm Johnsonville and Sims' Involvement.**

69.    Hormel subsequently demanded that Rummel permit forensic examination of his cell phone, and asked for Rummel's address so Hormel could send him a forensic collection kit.

70.    On May 27, 2025, Rummel informed Hormel that the forensic collection kit for his cell phone could be sent to an address in Sheboygan, Wisconsin that, based upon information and belief, is Sims' home address, and near Johnsonville's corporate headquarters.

71.    Upon information and belief, Rummel went to Sims' house with the intent to share the details of his interview with Hormel and develop a plan to protect his new role at Johnsonville.

72.    In subsequent communications regarding the forensic imaging of Rummel's phone and email, Rummel—who was still a Hormel employee at this point—expressed concern that the forensic examination would reveal "privileged" conversations he had with Nathan Ganfield ("Ganfield") and Maria Krieter ("Krieter").

73.    Ganfield is Johnsonville's Chief Corporate Development and Legal Officer, and Krieter is outside counsel for Johnsonville.[2]

---

[2] Although Krieter now represents Rummel, before June 1, 2025, a different lawyer and law firm represented Rummel and oversaw the imaging of his cell phone and email, which Hormel takes to indicate that Krieter was not representing Rummel in this window of time.

74.    Hormel forensically imaged Rummel's phone and email on May 30, 2025.

## III.   **HORMEL IMMEDIATELY ACTS TO PROTECT ITS MISAPPROPRIATED INFORMATION.**

75.    Hormel terminated Rummel for cause on May 30, 2025 due to his material breach of the Rummel Agreement and Hormel's Code of Ethical Business Conduct.

76.    The same day, Hormel sent a letter to Ganfield outlining Sims' and Rummel's violations of their agreements, detailing their unlawful behavior, and asking for a number of assurances from Johnsonville.

77.    Johnsonville refused to adequately provide the assurances reasonably requested by Hormel.

### COUNT I
### BREACH OF CONTRACT
### Against Sims

78.    Hormel restates and incorporates all preceding allegations as though fully set forth herein.

79.    The Sims Agreement is a valid and enforceable contract. Sims evinced his acceptance of Hormel's offer by executing the Sims Agreement.

80.    Sims voluntarily entered into the Sims Agreement in exchange for consideration and benefits provided by Hormel.

81.    Hormel complied with its obligations in the Sims Agreement and performed all conditions precedent.

82.    In the Sims Agreement, Sims agreed to, *inter alia*, terms imposing a duty of confidentiality and restricting solicitation.

13

83.     These covenants are reasonable and necessary to protect Hormel's legitimate business interests and employment relationships.

84.     Sims materially breached and continues to breach the Sims Agreement.

85.     As reflected in the Sims Agreement, Sims' non-solicitation restriction is tolled by any period of non-compliance.

86.     By such actions, Sims has caused and continues to cause Hormel immediate and irreparable harm for which Hormel has no adequate remedy at law and on account of which it has suffered damages, including but not limited to the separation of multiple employees.

87.     Hormel is entitled to attorney's fees and costs under the Sims Agreement.

**<u>COUNT II</u>**
**BREACH OF CONTRACT**
**Against Rummel**

88.     Hormel restates and incorporates all preceding allegations as though fully set forth herein.

89.     The Rummel Agreement is a valid and enforceable contract. Rummel evinced his acceptance of Hormel's offer by executing the Rummel Agreement.

90.     Rummel voluntarily entered into the Rummel Agreement in exchange for consideration and benefits provided by Hormel.

91.     Hormel complied with its obligations in the Rummel Agreement and performed all conditions precedent.

92.     In the Rummel Agreement, Rummel agreed to, *inter alia*, terms imposing a

duty of confidentiality.

93.    The covenant governing confidentiality is reasonable and necessary to protect Hormel's legitimate business interests.

94.    The information Rummel sent to his personal email account is "Proprietary Information" as defined under the Rummel Agreement.

95.    Rummel materially breached and continues to breach the Rummel Agreement.

96.    By such actions, Rummel has caused and continues to cause Hormel immediate and irreparable harm for which Hormel has no adequate remedy at law and on account of which it has suffered damages, including but not limited to the misappropriation and distribution of its confidential, proprietary, and trade secret information.

97.    Hormel is entitled to attorney's fees and costs under the Rummel Agreement.

<u>**COUNT III**</u>
**TORTIOUS INTERFERENCE WITH CONTRACT**
**Against Johnsonville**

98.    Hormel restates and incorporates all preceding allegations as though fully set forth herein.

99.    Sims and Rummel both agreed they would furnish copies of their agreements to any future employer, which would include Johnsonville.

100.    On information and belief, Johnsonville was aware that Sims and Rummel were employed by Hormel and that their employment was governed by the Sims and Rummel Agreements, which Johnsonville knew were valid contractual relationships.

101.    Johnsonville intentionally interfered with Hormel's contractual relationships, and intentionally procured the breach of those contractual relationships, by supporting Sims and Rummel in violating their contractual obligations to Hormel.

102.    On information and belief, Johnsonville coordinated with Sims with the purpose and intent of soliciting employees away from Hormel and, in doing so, induced Sims' breach of the Sims Agreement.

103.    On information and belief, Johnsonville coordinated with Rummel in the unlawful taking of Hormel's confidential, proprietary, and trade secret information and, in doing so, induced Rummel's breach of the Rummel Agreement.

104.    Johnsonville took these actions without justification or privilege, without proper means, and for improper purposes, including for the purpose of impairing Hormel's ability to compete in the sausage market and in order to benefit itself and give itself an unfair competitive advantage; Johnsonville's actions were a significant factor in causing Sims' and Rummel's breaches of their agreements.

105.    By such actions, Johnsonville has caused and continues to cause Hormel immediate and irreparable harm for which it has no adequate remedy at law, and has caused and continues to cause Hormel actual damages.

## COUNT IV
### MISAPPROPRIATION OF TRADE SECRETS
### UNDER THE DEFEND TRADE SECRETS ACT OF 2016
**Against Rummel**

106.    Hormel restates and incorporates all preceding allegations as though fully set forth herein.

107. The confidential and proprietary information that Hormel entrusted to Rummel, including specifically documents and information relating to its sausage business, product formulas, processing procedures, acquisition target information, and marketing strategy information, constitute trade secrets because Hormel derives independent economic value from that information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use. The information is particularly valuable to a competitor in the sausage market, such as Johnsonville, and would allow competitors to unfairly capitalize on Hormel's investment in its sausage business.

108. Hormel takes reasonable measures to maintain the secrecy of its trade secrets.

109. Due to Rummel's employment, he had direct access to and knowledge of Hormel's trade secrets, particularly relating to Hormel's sausage business.

110. The trade secret information Rummel obtained is related to Hormel's products used in interstate commerce, as Hormel distributes its products worldwide.

111. Under the Defend Trade Secrets Act of 2016 ("DTSA"), Rummel was prohibited from misappropriating Hormel's trade secrets.

112. Rummel misappropriated Hormel's trade secrets when he improperly and knowingly acquired, retained, used, and/or disclosed the trade secrets that he took from Hormel without authorization, by improper and unlawful means, and in breach of the Rummel Agreement. Rummel did so without Hormel's consent and knowing the trade secrets were acquired by improper and/or unlawful means.

113.    Rummel acquired and disclosed Hormel's trade secrets without Hormel's consent, including transmitting trade secrets to his personal email account.

114.    Rummel engaged in this conduct despite acquiring this information under circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Rummel owed and continues to owe to Hormel as a former employee.

115.    Under the DTSA, Rummel was prohibited from misappropriating Hormel's trade secrets when he knew or had reason to know that the trade secrets were acquired through improper means.

116.    Rummel's misappropriation of Hormel's trade secrets has been willful and malicious.

117.    As a direct and proximate result of Rummel's misappropriation of Hormel's trade secrets, Hormel has suffered and continues to suffer irreparable injury, and sustained significant damage. Hormel is entitled to any and all relief available at law, including pursuant to 18 U.S.C. § 1836(b)(3).

**COUNT V**
**MISAPPROPRIATION OF TRADE SECRETS UNDER**
**THE MINNESOTA UNIFORM TRADE SECRETS ACT**
**Against Rummel**

118.    Hormel restates and incorporates all preceding allegations as though fully set forth herein.

119.    The confidential and proprietary information that Hormel entrusted to Rummel, including specifically documents and information relating to its sausage business, product formulas, processing procedures, acquisition target information, and marketing

strategy information, constitute trade secrets because Hormel derives independent economic value from that information not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from their disclosure or use. The information is particularly valuable to a competitor in the sausage market, such as Johnsonville, and would allow competitors to unfairly capitalize on Hormel's investment in its sausage business.

120.    Hormel takes reasonable measures to maintain the secrecy of its trade secrets.

121.    Due to Rummel's employment, he had direct access to and knowledge of Hormel's trade secrets, particularly relating to Hormel's sausage business.

122.    The trade secret information Rummel obtained is related to Hormel's products used in interstate commerce, as Hormel distributes its products worldwide.

123.    Under the Minnesota Uniform Trade Secrets Act ("MUTSA"), Rummel was prohibited from misappropriating Hormel's trade secrets.

124.    Rummel misappropriated Hormel's trade secrets when he improperly and knowingly acquired, retained, used, and/or disclosed the trade secrets that he took from Hormel without authorization, by improper and unlawful means, and in breach of the Rummel Agreement. Rummel did so without Hormel's consent and knowing the trade secrets were acquired by improper and/or unlawful means.

125.    Rummel acquired and disclosed Hormel's trade secrets without Hormel's consent, including transmitting trade secrets to his personal email account.

126.    Rummel engaged in this conduct despite acquiring this information under

circumstances giving rise to a duty to maintain the information's secrecy and limit its use, which duty Rummel owed and continues to owe to Hormel as a former employee.

127.    Under the MUTSA, Rummel was prohibited from misappropriating Hormel's trade secrets when he knew or had reason to know that the trade secrets were acquired through improper means.

128.    Rummel's misappropriation of Hormel's trade secrets has been willful and malicious.

129.    As a direct and proximate result of Rummel's misappropriation of Hormel's trade secrets, Hormel has suffered and continues to suffer irreparable injury, and sustained significant damage. Hormel is entitled to any and all relief available at law, including pursuant to Minn. Stat. § 325C.03.

## COUNT VI
### BREACH OF EMPLOYEE DUTY OF CONFIDENTIALITY
### Against Rummel

130.    Hormel restates and incorporates all preceding allegations as though fully set forth herein.

131.    As an employee of Hormel, Rummel owed Hormel a duty not to disclose Hormel's confidential, proprietary, and trade secret information, including information about its sausage business, product formulas, processing procedures, acquisition target information, and marketing strategy information.

132.    By virtue of his employment at Hormel, Rummel had direct access to and knowledge of troves of Hormel's confidential, proprietary, and trade secret information.

133.    Rummel knew that information obtained by virtue of his employment was confidential, proprietary, and/or trade secret and should not be disclosed, as evidenced by his secretive behavior in sending the information to his personal email account and then traveling to Sims' house after Hormel discovered his behavior.

134.    Hormel took measures that were reasonable under the circumstances to protect its confidential, proprietary, and trade secret information from unauthorized disclosure.

135.    Rummel disclosed, used, and misappropriated Hormel's confidential, proprietary, and trade secret information by (a) sending this information to his personal email account and (b) using it, without express or implied consent from Hormel, all in order to aid his new employer, Johnsonville, and cause Hormel damage.

136.    As a direct and proximate result of Rummel's breach of his duty, Hormel has suffered and will continue to suffer irreparable injury and sustained significant damage.

### <u>COUNT VII</u>
### BREACH OF EMPLOYEE DUTY OF LOYALTY
### Against Rummel

137.    Hormel restates and incorporates all preceding allegations as though fully set forth herein.

138.    Hormel and Johnsonville compete in the sausage market.

139.    Rummel had a duty of loyalty to Hormel which he breached by, while still employed by Hormel, engaging in acts of secret competition intended to assist himself and Johnsonville, including but not limited to misappropriating Hormel's confidential,

proprietary, and trade secret information and engaging with other Johnsonville employees and legal representatives.

140.    Rummel acted with the purpose of injuring Hormel, and his disloyal conduct has caused Hormel to suffer damages and hindered its business.

141.    Rummel's actions were intentional, willful, and malicious.

## **DEMAND FOR JURY TRIAL**

Hormel respectfully demands a trial by jury on all counts.

## **REQUEST FOR RELIEF**

WHEREFORE, Hormel respectfully requests that judgment be entered in its favor and against Defendants granting all relief requested in this Complaint and/or allowed at law or in equity, including:

1.    An Order and other appropriate equitable relief that:

   a.    Requires Sims to comply with the terms of the Sims Agreement;

   b.    Extends the "Restricted Period" in the Sims Agreement to one year from the date of the Court's order;

   c.    Requires Rummel to comply with the terms of the Rummel Agreement;

   d.    Extends the "Restricted Period" in the Rummel Agreement to one year from the date of the Court's order;

   e.    Enjoins Johnsonville from interfering with the Sims Agreement and Rummel Agreement;

   f.    Orders Rummel to (i) deliver to Hormel all Hormel confidential, proprietary, and trade secret information in his possession, custody, or control; (ii) itemize and then destroy all Hormel confidential, proprietary, and trade secret information in non-deliverable form in his possession, custody, or control, including, without limitation, the

deletion of all documentation, information, or data from files and storage media, (iii) refrain from using or disclosing any Hormel confidential, proprietary, or trade secret information in his possession, custody or control; and

g.    Requires Rummel to take all necessary efforts to ensure that all electronic devices, email accounts, cloud storage accounts, and any other device or medium in his possession do not have any access to Hormel's confidential, proprietary, or trade secret information.

h.    Requires Rummel to retrieve, return and/or destroy Hormel's confidential, proprietary, or trade secret information from Johnsonville or any third party to whom the information was disclosed, and to advise such third party that the information was misappropriated and should not be further used or disclosed.

2.    Awarding Judgment in favor of Hormel and against Defendants;

3.    Awarding Hormel actual damages, contractual damages, tort damages, and disgorgement of amounts by which Defendants were unjustly enriched, or in the alternative, a reasonable royalty;

4.    Awarding Hormel the compensation it paid to Rummel during his period of disloyalty;

5.    Granting Hormel the ability to seek punitive damages under Minnesota law, and awarding Hormel punitive and/or exemplary damages;

6.    Awarding Hormel of pre- and post-judgment interest;

7.    Awarding Hormel its reasonable attorneys' fees, disbursements, and costs incurred in this action; and

8.    Awarding Hormel such other and further relief as the Court deems just and proper.

Dated: June 18, 2025

s/*Joseph M. Sokolowski*

Joseph M. Sokolowski (#0178366)
Kurt Niederluecke (#0271597)
Janet M. Dorr (#0393311)
**FREDRIKSON & BYRON, P.A.**
60 South Sixth Street, Suite 1500
Minneapolis, MN 55402-4400
Telephone: 612.492.7000
jsokolowski@fredlaw.com
kniederluecke@fredlaw.com
jdorr@fredlaw.com

*Attorneys for Plaintiff*